# OGLESBY v. MISSOURI PACIFIC RAILWAY COMPANY,. Appellant.

## In Banc, November 3, 1903.

1. **Practice:** DEMURRER TO EVIDENCE. Where defendant's demurrer to the evidence at the close of plaintiff's case has been overruled, and defendant proceeds to offer its evidence, and a demurrer is again offered and overruled, the appellate court, in passing on the question of whether or not the case should have been submitted to the jury, will consider the case as a whole, and will dispose of the demurrer in view of all the facts developed, those offered by plaintiff, as well as those shown by defendant.

2. **Negligence:** DEFECTIVE CAR: NOT CAUSE OF INJURY. Where the petition charged that the wreck of a train in which plaintiff (a brakeman) was injured was caused by the breaking down of a certain car, the court should sustain a demurrer to the evidence if there is a total failure of facts showing that the breaking down of that car was the proximate cause of the wreck. Although the evidence may show that the sills of that car were doty, worm-eaten and defective, and known by the company to be such, yet that proof does not establish the fact that those defects were the cause of the wreck.

3. ————: ————: ————: FACTS IN CASE. Plaintiff, a brakeman, testified that he thought the train would be ditched on account of the dangerous and rapid rate of speed at which it was being run down grade with steam on, and the only other eyewitnesses (both brakemen) testified that the car, the defective condition of which plaintiff alleged caused the wreck, "was whole when it left the track and the damage to it was caused afterwards." *Held,* that these facts do not tend to show that the defective condition of this car was the proximate cause of the wreck, but tend to establish the contrary, to-wit, that the wreck was caused by a too rapid running of the train, or the jumping from the track by this car, from that or some other cause. If the car jumped the track in an unbroken condition, while the train was rapidly running down grade, a wreck was inevitable, and hence, the defective condition of the car was not the original primary cause of the wreck.

4. ————: IRRECONCILABLE PHYSICAL FACTS. When a part of the physical facts standing alone go to establish the averments of the petition, and the other physical facts tend to disprove those averments,

Oglesby v. Mo. Pac. Ry. Co.

a verdict based on the physical facts alone can not be permitted to stand. The physical facts must, just as an eyewitness, tell one uniform, consistent and reconcilable story.

5. ———: BRAKEMAN. A brakeman on a train does not make out a prima facie case entitling him to recover for injuries received by showing that he was at work at the place assigned him on the train, that a car in the train was defectively constructed, that the train was wrecked and he was injured. His relation to the company is not that of a passenger. In such case it is necessary for plaintiff to allege the particular cause of the wreck, and to prove the cause alleged, and if there is a total failure of proof of that cause, a verdict for him must be set aside. Proof of the mere fact that the train was wrecked is not sufficient.

PER VALLIANT, J., DISSENTING, WITH WHOM BRACE AND GANTT, JJ., CONCUR.

1. Negligence: FELLOW-SERVANTS: INSPECTOR AND BRAKEMAN. The inspector of cars is not a fellow-servant of the brakeman on the train in which such car is placed. The law in such case is that for negligence in the discharge of those personal duties which the master owes to his servants to supply them with reasonably safe cars, the master is liable whether he acts in person or through his servant, the inspector, and in such case the inspector represents his master.

2. ———: DEFECTIVE CAR: CAUSE OF WRECK: FACTS IN EVIDENCE. Plaintiff alleged that the wreck of the train on which he was a brakeman and was injured, was caused by the breaking in two of a defective car, whose sills were doty and worm-eaten. The car had a registered capacity of 60,000 pounds, five days before had hauled a cargo of 31,800 pounds of nails, on the day of the wreck was loaded with 30,000 pounds of barreled flour, at the last station before the wreck was observed by the baggageman to be sagged down, and at the time of the wreck the train of eighteen cars was running twenty or twenty-five miles an hour down grade, around a curve, with steam on. This car was the one next to the tender, and plaintiff, a brakeman, was on the fifth car behind. There was sufficient evidence to sustain the jury's verdict that the sills of the car were doty, brash and worm-eaten, and the remaining issue was to show that its breaking in two caused the wreck in which plaintiff was injured. On this issue the only eyewitnesses were the other two brakemen, one of whom was called by plaintiff, both of whom testified that the car was whole when it left the track, and one of them that after it left the track it rolled over the embankment. Other witnesses testified that when they reached the wreck the car was broken in two, that about one-third of it remained attached to the tender, and was off the track; that the tender was

off the track, but attached to the engine; that the large wheels of the engine were off the track, but close by the rails; that the small fore wheels of the engine were still on the track; that the remaining part of the car was still on the track, some distance behind the engine; that its sills had broken square off, had plowed into the ground, that it had formed a barrier to the cars behind it, and eight or ten other cars had piled up against it, and were broken and wrecked, and that plaintiff was caught under one of them and badly injured. *Held*, that this evidence was sufficient to submit to the jury the issue of whether or not the defective condition of the car caused the wrecking of the train, and the consequent injury of plaintiff.

3. **Evidence:** BINDING EFFECT OF ONE'S OWN WITNESS. The law does not permit a party to impeach the veracity of his own witness, even when he calls one out of his adversary's ranks, but it does not hold a party bound by everything his witness may say.

4. **Negligence:** INSPECTOR OF CARS: MATTER FOR JURY. The duty of the railroad company to inspect its cars with the view of keeping them in a reasonably safe condition for the use of its employees, is not performed by a mere formal or perfunctory inspection, nor can it shift the responsibility by delegating the performance of the duty to a servant; and whether in any case it has exercised the care in this respect which the law imposes on it, is a question of fact for the jury.

5. ————: BURDEN OF PROOF: PHYSICAL FACTS: RES IPSA LOQUITUR. The burden is on the plaintiff to show that the injury was the result of defendant's negligence, but the plaintiff does not have the affirmative of every question of fact that arises out of the evidence in the case. The burden may not be on plaintiff to show how the accident which injured him did occur. The law of *res ipsa loquitur* is that when the thing itself has spoken and given demonstrative evidence of negligence, the effect is to make a prima facie case for plaintiff, which calls on defendant to show that notwithstanding the condition of the thing the defendant had in fact exercised the degree of care imposed by law to discover or remedy the defect and had been unable to do so; and this rule is applicable to cases between master and servant, as well as between carrier and passenger, the difference in application being in degree.

6. **Evidence:** INSPECTION: REBUTTAL. Where the defendant has assumed the affirmative of showing that the car which caused the wreck was properly inspected, it is proper to permit plaintiff to introduce in rebuttal evidence as to the character of defendant's inspection.

7. ————: REBUTTAL: EXTENT OF CROSS-EXAMINATION. The defendant can not question plaintiff on a point other than that for which he was recalled in rebuttal.

Appeal from Pettis Circuit Court.—*Hon. Geo. H. Longan,* Judge.

REVERSED.

*Martin L. Clardy* and *R. T. Railey* for appellant.

(1) Where an attorney makes improper remarks in his argument to the jury, it is not sufficient for the court to sustain an objection thereto, but it must direct the jury to disregard same; and even then, a new trial may be granted. Smith v. Tel. Co., 55 Mo. App. 628; Ensor v. Smith, 57 Mo. App. 596; 1 Thompson on Trials, secs. 264 and 266; Stratton v. Nye, 63 N. W. 928; Andrews v. Railroad, 71 N. W. 377; A. L. & L. S. Co. v. May, 71 N. W. 69; Sutton v. Railroad, 73 N. W. 995; Railroad v. Kellogg, 76 N. W. 464; Rudiger v. Railroad, 77 N. W. 171; Taylor v. Railroad, 79 N. W. 18; Hennies v. Vogel, 87 Ill. 242; Magoon v. Railroad, 31 Atl. 156; Tucker v. Henniker, 41 N. H. 317; Martin v. State, 63 Miss. 505; Rudolph v. Landwerlen, 92 Ind. 34. (2) It is not charged or claimed in the petition that defendant's inspectors were incompetent. Hence, if the inspectors were guilty of personal negligence in not properly inspecting the "U. L." car, plaintiff is not entitled to recover, as he and said inspectors were fellow-servants. This is true whether considered by departmental rule or the common law. Graltes v. Railroad, 153 Mo. 385; Schaub v. Railroad, 106 Mo. 88; Railroad v. Miller, 117 Ind. 439; Neutz v. Coal Co., 139 Ind. 411; Thymy v. Railroad, 156 Mass. 13. But even if the master be responsible for the personal negligence of its inspectors, yet the petition must allege the duty, and charge defendant with a violation of the same. Although plaintiff may allege general negligence in petition, yet if it is followed by a specific charge of negligence, as in this case, the plaintiff will be confined in his proof to the specific charge so made. Feary v.

Railroad, 62 S. W. 457; Bartley v. Railroad, 148 Mo. 139; Chitty v. Railroad, 148 Mo. 74; McCarty v. Hotel Co., 144 Mo. 402; Huston v. Tyler, 140 Mo. 263; McManamee v. Railroad, 135 Mo. 447; Hite v. Railroad, 130 Mo. 136; Waldhier v. Railroad, 71 Mo. 518. There is no charge in the petition to the effect that defendant was guilty of negligence in failing to have in its service a sufficient number of inspectors to inspect its cars on the date alleged in petition. If this had been true, it was an independent act of negligence on the part of defendant, in respect to a duty which it owed to plaintiff. Plaintiff having elected in the petition to charge defendant with personal negligence in failing to inspect said "U. L." car, had no legal right, under the authorities heretofore cited, to introduce evidence in chief, much less rebuttal, for the purpose of convicting defendant of negligence in failing to have a sufficient number of inspectors to inspect said car. (3) Over objections of defendant the court permitted the plaintiff in rebuttal to examine witness Zeigler as follows: "Q. How long would it take, Mr. Zeigler, to make a thorough and proper inspection of a freight car? A. About ten to twenty-five minutes." This question, over objections of defendant, was submitted to witness as an expert. The admission of such testimony authorized the jury to roam at will in the fields of conjecture, and to convict defendant's inspectors of negligence regardless of any standard in general use among the railroads. It left the witness in his own mind to determine what was a thorough inspection. Bates v. Railroad, 45 N. E. 111. The question and answer having gone to the jury with the sanction of the court, it imposed a duty on defendant not required by either the law or exigencies of trade. Guttridge v. Railroad, 94 Mo. 472; State v. Palmer, 61 S. W. 657; Graney v. Railroad, 157 Mo. 682; Langston v. Railroad, 147 Mo. 465; Boettger v. Iron Co., 136 Mo. 536; Benjamin v. Railroad, 133 Mo. 288; King v. Railroad, 98 Mo. 240; Eu-

bank v. City of Edina, 88 Mo. 655; Koons v. Railroad, 65 Mo. 597; Gavisk v. Railroad, 49 Mo. 276; Benjamin v. Railroad, 50 Mo. App. 610; Muff v. Railroad, 22 Mo. App. 584; Railroad v. Smith, 61 S. W. 3; Brown v. Mitchell, 31 S. W. 628; Railroad v. Sheldon, 51 Pac. 808; Jones v. Portland, 50 N. W. 731; Briggs v. Railroad, 53 N. W. 1019; Lawson on Exp. Ev., 30; Rogers on Exp. Tes., sec. 53, pp. 127-8-9. (4) The charge of negligence, when boiled down, is to the effect that defendant on December 11, 1892, took into its train at Kansas City an unsafe, rotten car, which broke down, wrecked the train and injured plaintiff. The answer was practically a general denial, and put in issue the foregoing. The elementary question to be decided was whether defendant's inspectors had exercised ordinary care in inspecting said car for safety, before it departed on its journey. Every fact, therefore, which plaintiff relied upon to substantiate this charge, was a part of his case in chief. Under the rules of pleading, any man who has the testimony at hand, to prove negligence in three different ways, can not be permitted to introduce his testimony tending to establish negligence in one respect, as a part of his case in chief, and then reserve the remainder as rebuttal. R. S. 1899, sec. 592; R. S. 1889, sec. 2039; Pier v. Heinrichoffen, 52 Mo. 335; Christal v. Craig, 80 Mo. 375; Feary v. Railroad, 62 S. W. 457. Plaintiff testified, over objection of defendant in rebuttal, in respect to matters which were a part of his case in chief, and defendant moved to strike it out as rebutting testimony. The court overruled said motion, and exceptions were duly saved. Plaintiff on cross-examination said that after leaving Kansas City on the morning of the accident, and before he got to Independence, some tramps got on his train and on this "U. L." car. He said he made them get off at Big Blue bridge. At this stage of the case the court held that plaintiff could not be cross-examined upon any matters not formerly asked about, or which related to

the inspection. This court at an early date held that when a witness was put on the stand and examined about any matter, the opposite side had the right to cross-examine him about the whole case. Page v. Kankey, 6 Mo. 433; Brown v. Burrus, 8 Mo. 26; Railroad v. Silver, 56 Mo. 266; State v. Brady, 87 Mo. 145. (5) (a) The plaintiff in his petition did not in any respect attack defendant's system of inspection in use at either Atchison or Kansas City. (b) He did not in the petition aver that defendant failed to have a sufficient number of inspectors to do the work at either place. (c) He did not aver in the petition that the switchmen ran the cars out of the yard before the inspectors had sufficient time to inspect the same. If any one or more of the three foregoing propositions had been alleged in petition, and the facts had sustained the same, such facts would have constituted negligence upon the part of defendant. The plaintiff in lieu of setting out any of the three propositions, supra, in petition, relied upon the doctrine of *res ipsa loquitur,* and claimed thereby that the car spoke for itself. He saw fit to stand in his petition, on the last proposition. Not only did plaintiff fail to allege any of said three charges in petition, but he failed to offer in chief any evidence in respect to any of said three charges. The defendant, in its answer, tendered no issue as to said three charges. The defendant offered no evidence relating in any particular to any of said three charges. There could, therefore, be nothing for plaintiff to rebut in respect to any. Yet the court, in the face of defendant's objection, permitted plaintiff's witnesses, under the guise of rebuttal, to attack, first, defendant's system of inspection, by attempting to show that it did not allow its men a sufficient length of time to inspect car; second, it permitted plaintiff, under the guise of rebuttal, to offer testimony tending to show that defendant did not have a sufficient number of inspectors to do the work at Kansas City; third, it permitted plaintiff to in-

troduce evidence tending to convict defendant of negligence, in permitting the switchmen in charge of the yards to remove and switch cars as they came in, before the inspectors had time to inspect same, and that by reason thereof said cars passed without inspection. The admission of this damaging testimony, in respect to the three propositions, supra, which had not been pleaded by either plaintiff or defendant, and which were not referred to in evidence in chief by either plaintiff or defendant, was well calculated to influence the jury to return a verdict for plaintiff. (6) Plaintiff had the right to prove that the facts testified to by witness Hessler were different, but under the law he vouched for the credit and veracity of said witness when he was put upon the stand. Imhoff & Co. v. McArthur, 146 Mo. 377; Bensberg v. Harris, 46 Mo. App. 406. There is no intimation in the record that he had not testified truthfully nor does the record contain a syllable of evidence which in the least impairs the truthfulness of the testimony of said witness. We understand the rule of law in this State to be that if the facts are shown by competent evidence on one side, and the evidence is not contradicted on the other, and there is no attempt to impeach the witness, there is no question of fact involved in the case, but simply a question of law is presented. Studybaker v. Cofield, 159 Mo. 600; Davies v. Railroad, 159 Mo. 7; Carter v. Railroad, 156 Mo. 642; King v. King, 155 Mo. 425; May v. Crawford, 150 Mo. 527; Bartley v. Railroad, 148 Mo. 140; Culbertson v. Railroad, 140 Mo. 63; Spillane v. Railroad, 135 Mo. 427; Hite v. Railroad, 130 Mo. 132; Reichenbach v. Ellerbe, 115 Mo. 588; Lynch v. Railroad, 112 Mo. 433. (7) Upon the facts the cause should be reversed without remanding. Under the laws of this State a proceeding to construe a will is an action at law, and as such is just as much triable by a jury as the case at bar. The rule is well settled in Missouri that in a will contest the burden of proof in the first instance

devolves upon the defendants or proponents.   When the latter introduces the two attesting witnesses, and proves by them that testator was over twenty-one years of age, was of sound mind, and executed the instrument according to the forms of law, it then becomes the duty of plaintiff to overcome the case made by defendants, and if the plaintiff fails to introduce any evidence, it then becomes the plain duty of the trial court to direct a verdict in favor of defendant, sustaining the will.   If, in a will contest, the two attesting witnesses testified to the facts aforesaid, and there was no other evidence in the record tending to show that their testimony was false, would this court for one moment let a verdict stand overturning the will?   Would it not reverse the cause with instructions to enter a decree sustaining the will, on the defendant's evidence alone?   Such has been the law in this State for years.   Campbell v. Carlisle, 63 S. W. 703; Riggin v. Trustees, 61 S. W. 804; Schierbaum v. Schemme, 157 Mo. 22; Tibbe v. Kamp, 154 Mo. 580; Sehr v. Lindemann, 153 Mo. 288; Fulbright v. Perry Co., 145 Mo. 442; Defoe v. Defoe, 144 Mo. 466; McFadin v. Catron, 138 Mo. 226; Carl v. Gabel, 120 Mo. 295; Maddox v. Maddox, 114 Mo. 46.   This court at an early day announced the rule of law that where the evidence is of that character that the trial judge would have a plain duty to perform in setting aside the verdict as unsupported by the evidence, it is his duty and his prerogative to interfere before submission to the jury, and direct a verdict for defendant.   Riggin v. Trustees, 61 S. W. 805; Davies v. Railroad, 159 Mo. 8; State to use v. O'Neil, 151 Mo. 89; Bartley v. Railroad, 148 Mo. 140; Etlinger v. Kahn, 134 Mo. 497; Hite v. Railroad, 130 Mo. 141; Reichenbach v. Ellerbe, 115 Mo. 588; Powell v. Railroad, 76 Mo. 80.   (8)   This car may have been unsound; the inspectors may not have seen it at all, and yet it may not have been the cause of the accident.   (9)   (a) "If the evidence is equally consistent with either view—with the existence or non-

existence of negligence—it is not competent for the judge to leave the matter to the jury. The party who affirms negligence has altogether failed to establish it.'' Cotton v. Wood, 8 C. B. (N. S.) 571; O'Malley v. Railroad, 113 Mo. 325; Perkins v. Railroad, 103 Mo. 52; Glick v. Railroad, 57 Mo. App. 105; Peck v. Railroad, 31 Mo. App. 125; Moore v. Railroad, 28 Mo. App. 625; Railroad v. Shertle, 97 Pa. St. 450; Hays v. Railroad, 97 N. Y. 259; Baulec v. Railroad, 59 N. Y. 366; Duncan v. Tel. Co., 58 N. W. 75; Megow v. Railroad, 56 N. W. 1099; Orth v. Railroad, 50 N. W. 364; Wintuska's Admr. v. Railroad, 20 S. W. 820; Hughes v. Railroad, 16 S. W. 275. (b) The jury had no right to convict defendant of negligence in regard to the inspection upon mere conjecture and without any substantial evidence on which to base their verdict. The jury likewise had no right, upon the evidence in this case, to draw the inference from the defects pointed out that defendant's inspectors were guilty of negligence in failing to discover same. This brings us to one of the most important propositions in the case, to-wit: Whether the car was shown to be unsound and unfit for use, and, if so, whether the defects attempted to be pointed out, were of such character that the jury had the right to draw the inference that the inspectors had failed to perform their duty in regard to this car, as to which see: 3 Elliott on Railroads, sec. 1308; McPadden v. Railroad, 44 N. Y. 480; Shearman and Redfield on Neg. (3 Ed.), sec. 87; Wood's Law Mast. & Serv. (2 Ed.), p. 819; Pierce on Railroads, p. 383; 2 Rorer on Railroads, pp. 1200-1201; Krampe v. St. L. B. A., 59 Mo. App. 283; Moss v. Railroad, 49 Mo. 170; Murphy v. Railroad, 71 Mo. 202; Roblin v. Railroad, 119 Mo. 484; Sack v. Dolese, 27 N. E. 64; Railroad v. Bates, 45 N. E. 110.

*O. L. Houts* for respondent.

(1) It was the duty of the defendant to use reasonable care and precaution to furnish and maintain safe

cars for plaintiff in the performance of his duties as brakeman. Under competent evidence and instructions, more favorable to defendant than it was entitled to, the jury found that defendant failed in that duty; that it furnished plaintiff a car that was defective, rotten and decayed; that defendant knew, or by the exercise of ordinary care might have known, of the condition of the car; and that by reason of its defective condition it broke down and injured plaintiff. The verdict of the jury was approved by the trial judge and is conclusive. This case has been twice tried. At the former trial, in another circuit, before another circuit judge, plaintiff obtained a verdict and for the same amount, which that judge approved. Plaintiff respectfully insists that he ought to recover and that this judgment should not be disturbed. Parsons v. Railroad, 94 Mo. 286; Gutridge v. Railroad, 94 Mo. 468; Gutridge v. Railroad, 105 Mo. 520; Hurlbut v. Railroad, 130 Mo. 657; Bender v. Railroad, 137 Mo. 240; O'Mellia v. Railroad, 115 Mo. 205; Coontz v. Railroad, 120 Mo. 652; Bowen v. Railroad, 95 Mo. 268; Clowers v. Railroad, 21 Mo. App. 213; Lumber Co. v. Ligas, 172 Ill. 315. (2) Under the authorities cited it was the duty of defendant to plaintiff to make such inspection as was proper and reasonable, the hazard and danger attending the use of its cars considered, regardless of the fact whether other railroads performed such duty or not. Clowers v. Railroad, 21 Mo. App. 213. It was defendant's duty to protect plaintiff from latent and hidden defects if it could have discovered them by reasonable, ordinary care. Plaintiff had a right to assume that the car was safe; but it was the duty of the defendant to have looked, and to have hunted for defects. Parsons v. Railroad, 94 Mo. 286; Gutridge v. Railroad, 105 Mo. 520; Clowers v. Railroad, 21 Mo. App. 213. This is the doctrine everywhere and is elementary. Lumber Co. v. Ligas, 172 Ill. 315; Wood on Master and Servant, 680. The defects of this car were, to the eye of an inspector, patent and not hidden

or latent. It looked old; was sagged three inches, indicating a weakness in the center; and was rotten, worm-eaten and doty. From such defects defendant and its inspectors knew that the car was unfit for service. Under the authorities and the evidence, the fact alone that the car looked old and was sagged, was enough to have required of defendant and its inspectors such an examination as would have shown that the car was, worm-eaten, rotten and unsafe. Gutridge v. Railroad, 105 Mo. 527; Railroad v. Fry, 131 Ind. 327, 28 N. E. 991. With all the evidence, facts and circumstances before the jury, as to the defects of this car, the way in which it broke down, the manner in which the wreck occurred, the observations of the eye witnesses and the general character of inspection in the yards of defendant through which the car passed, it was for the jury to say whether the car was unfit for service, and broke down and caused plaintiff's injury, and whether defendant had exercised reasonable and ordinary care. Plaintiff did not have to prove his case by experts; nor was the jury compelled to accept the opinion of experts if given. Bowen v. Railroad, 95 Mo. 268; Coontz v. Railroad, 121 Mo. 652; Hurlbut v. Railroad, 130 Mo. 657; Gutridge v. Railroad, 94 Mo. 468. If defendant had produced inspectors at the trial, which it did not do, from Atchison and Kansas City, and they had testified that they had inspected the car on the day of the wreck and found no defects, the question of reasonable care, under all the evidence, still would have been one for the jury. Bowen v. Railroad, 95 Mo. 268; Coontz v. Railroad, 121 Mo. 652. The physical fact that this car looked old, was sagged three inches, was worm-eaten, rotten and doty, contradicted all evidence of reasonable care, or of competent inspection, if defendant had introduced such evidence. This fact the jury had a right to consider. Lane v. Railroad, 132 Mo. 4; Huggart v. Railroad, 134 Mo. 680. There was evidence introduced in this case,

facts testified to by witnesses showing, conclusively, as plaintiff thinks, but tending to show, undoubtedly, want of reasonable or ordinary care upon the part of defendant. The law does not presume, then, that defendant exercised such care; or that its inspectors were competent; or that they did their duty; or that they inspected this car; or that they found no defects; or that if they did find defects they deemed them immaterial; or that they were justified in so concluding. All of these were questions of fact for the jury. Defendant, therefore, tried this case, drew its instructions and has presented it to this court on a false theory. The law will not permit defendant to deprive plaintiff of the benefit of testimony of sworn witnesses, or to presume him out of his rights. No proposition is better settled. Hamm v. Barrett, 28 Mo. 388; Grover's Admrs. v. Duhle, 19 Mo. 360; Moberly v. Railroad, 98 Mo. 183; Meyers v. Kansas City, 108 Mo. 487; Rapp v. Railroad, 106 Mo. 423 Lynch v. Railroad, 112 Mo. 420; Erhart v. Ditrich, 118 Mo. 430; Bluedorn v. Railroad, 121 Mo. 270; Shepers v. Railroad, 126 Mo. 670; Weller v. Railroad, 152 Mo. 449. Upon the authorities cited, defendant's demurrer to the evidence was properly overruled. On the former appeal this court held this was a case for the jury, settling this question. Oglesby v. Railroad, 150 Mo. 137. (3) Plaintiff and defendant's inspectors were not fellow servants. Long v. Railroad, 65 Mo. 225; Rodney v. Railroad, 127 Mo. 676. (4) Plaintiff's petition is good and his evidence offered under the petition and in rebuttal of the evidence offered by defendant was competent. Plaintiff has not sued for negligence of a fellow servant; or for negligence on the part of defendant in the employment of a fellow servant; but for negligence on the part of defendant in failing to furnish plaintiff a reasonably safe car, a personal duty it owed him and one it could not delegate. It was perfectly competent, then, for plaintiff, in rebuttal of evidence offered by defendant, to offer evi-

dence tending to show that the defendant's inspection was imperfect because it did not allow sufficient time, or had not a sufficient number of men for the same, or that they were incompetent and neglected their duty. The petition is in the usual form, often approved by this court. Bender v. Railroad, 137 Mo. 240; Hurlbut v. Railroad, 130 Mo. 657; Condon v. Railroad, 78 Mo. 567; Gutridge v. Railroad, 94 Mo. 468. Plaintiff's evidence offered in rebuttal tended to disprove "new points first opened by defendant," and was rebuttal in the strictest sense of the term. Christal v. Craig, 80 Mo. 375; Oglesby v. Railroad, 150 Mo. 137; McFarland v. Ins. Co., 124 Mo. 222.

ROBINSON, C. J.—This is an action for damages growing out of injuries received by plaintiff in December, 1892, while in the employ of defendant railway company as brakeman on one of its freight trains running between Kansas City and St. Louis. The contest between the parties hereto has had quite a long and eventful history. In a former suit between the same parties, growing out of the same occurrence, the case came here then, as now, on defendant's appeal from a judgment in favor of plaintiff, at which time, opinions by four members of this court were written. When the judgment in that suit, Oglesby v. Mo. Pac. Ry. Co., reported in 150 Mo. 137, was reversed and remanded, as the result of the diverse views expressed by the different members of the court, and the cause was returned to the circuit court of Bates county for rehearing, plaintiff dismissed that suit and began anew in his home county of Johnson the present suit, this last action, however, differing from the first in this particular only, that now, no act of negligence is charged to defendant on account of the rapid rate of speed of the train at the time plaintiff received his injuries, as was done in plaintiff's former petition filed; but the absence of that averment from the present petition makes the consid-

eration of the effect of the existence of that fact, in so far as it has been given as plaintiff's version of the cause of the wreck that resulted in his injury, of no less consequence than it was at the former hearing of the original suit, when that allegation of negligence was contained. In the present action the grounds of negligence charged are:

"That defendant negligently furnished and placed and allowed to be placed, operated and used in said train at said time on said trip a car numbered 7919, with the initials 'U. L.' thereon, which was at the time unfit for service, unsafe, old, worn, and out of repair, and the timbers of which were decayed and rotten, worm-eaten and doty. That at the time defendant knew, and by the exercise of ordinary care and prudence might have known, of the condition of said car and that it was unsafe, unfit for service, out of repair, old, worn, rotten, decayed, worm-eaten, and doty. That at said time, on the said 11th day of December, 1892, by reason of the old, worn, decayed, rotten, worm-eaten, doty and unsafe condition of said car and because the same was out of repair as aforesaid, and while said train and cars were being operated by defendant as aforesaid on its said line of railway at a point west of what is called Little Blue Switch in Jackson county, Missouri, the said car broke and the said car and train were wrecked and thrown from the track, and plaintiff by reason thereof and while in the line of his duty as brakeman on said train in the employ of defendant as aforesaid, and without fault on his part, was then and there thrown to the ground and track and the cars thrown upon him, by reason of which his right leg was crushed," etc.

On the appeal in this case, as when the case was here before, the controlling controversy is over the question whether upon all the facts developed the case should have been submitted to the jury. Other minor questions have been presented by the defendant on this appeal, but as none of them in our judgment are suffi-

cient to effect a reversal of the judgment found, if that judgment is predicated upon facts from which the jury had the right to make a determination, they need not be mentioned.

What then, are the facts in the case as shown and established by all the witnesses? Though the defendant offered a demurrer to the testimony at the close of plaintiff's case, when that demurrer was overruled, it did not choose to stand thereon, but gave to the court and the jury its testimony, and we must consider it now along with that of the plaintiff's, as one whole, and if from all the facts shown, the case was one to go to the jury it is not the province of this court, on appeal, to interfere therewith, or to disturb the judgment based thereon.

The testimony on the part of plaintiff tended to show that this "U. L." car left Kansas City loaded with 30,000 pounds of flour on the morning of December 11, 1892, in a train of 18 cars bound for St. Louis; that this "U. L." car was the first car of the train and was fastened to the rear end of the tender by means of an iron link and pin; that plaintiff was the forward one of three brakemen in charge of the train and that his position at the time of the wreck was upon the fifth car from the engine that was used to pull the train; that when the train reached a point near what is called Little Blue Switch in Jackson county, about seven miles out from Independence, while running down a steep grade on the road and around a sharp curve, it was wrecked and plaintiff was found under the car upon which he was riding with his right leg broken and crushed, and otherwise bruised and mangled. Plaintiff's testimony tended to show that this "U. L." car, as it is called, was old, and that its longitudinal sills were rotten, worm-eaten and doty, and when observed after the wreck they were found to have been broken square in two about ten feet back from the forward end of the car. The testimony on part of defendant tended

to show that this ''U. L.'' car was sound, in good condition and comparatively new; that it was built to carry 60,000 pounds, while at the time of the wreck it was carrying only 30,000 pounds of barreled flour; that it had been inspected at Atchison, Kansas, and Kansas City, Missouri, and that no defects were noticed, and that at the time of the accident the train was not running more than 20 or 25 miles an hour. It was stipulated by the parties that this ''U. L.'' car was received in Atchison, Kansas, December 5, 1892, having come over defendant's road from St. Louis loaded with 31,-000 pounds of nails, and that it remained in Atchison on defendant's premises unloaded until December 10, 1892.

While in general the testimony in the present case is substantially as it was on the former appeal of the case between the same parties, reported in 150 Mo. supra, and the statement of the facts on the former appeal might have been adopted as the statement of the facts of this case in so far as they went, a few new facts were brought out at the present hearing, and the testimony of several witnesses called by plaintiff was developed with more distinctness upon the question as to the character and extent of the defects appearing in the broken sills of this ''U. L.'' car, which will be noted below.

Of the new facts brought out in the present case that were not made to appear when the case was here on its first hearing, one was that this ''U. L.'' car was observed to be sagged in the center some two or three inches as it passed Independence station, a distance of six or seven miles from where the train in which it was hauled was wrecked a few minutes afterwards. Several witnesses, some called by the plaintiff and one called by the defendant, in answer to the question, what this sagging of a car in the center two or three inches would indicate? gave it as their opinion that such

a condition would indicate that the car was weak in some of its parts, and that it needed to be repaired.

Two witnesses, fellow brakemen on the train with plaintiff at the time of the accident, and the only eye witnesses to the occurrence of the event who testified at the trial as to the condition of this car immediately preceding and at the time of the wreck, one testifying in behalf of plaintiff, the other called by defendant, said that this "U. L." car was yet whole after it had left or jumped the tracks and was running upon the ties of the roadbed and before it turned over or broke down upon the track.   There was also testimony at this, as at the other trial of the case, showing that one or more of the steel or iron rails of this track were discovered to be broken in two, and very badly out of shape and bent when the wreck was viewed, and that the track generally, under the wreck, was badly torn up and out of place.   The testimony also disclosed the facts to be that of the 10 or 12 wrecked cars, all were more or less mashed up and broken, and that several of them were more badly broken up than this "U. L." car, which plaintiff now claims was the cause of the wreck.   The engineer and fireman of this train both testified that the first thing they knew of anything going wrong with their train was that the wheels of the tender and engine were off the tracks and running upon the ties and that as they turned to see what had become of the train they discovered it in a heap, piled upon either side of the track back of them a distance of 100 feet or more, except about one-third of the forward end of this "U. L." car and the forward trucks under it, which remained fastened to the tender just back of them.   That the wheels of the trucks under that part of this "U. L." car, that remained fastened to the tender, as well as the wheels of the trucks of the tender and engine (except the small wheels of the forward truck of the engine), were off of the iron rails of the tracks, and that the

Vol 177 mo—19

wooden cross ties over which they had run for a considerable distance back from where the engine and tender had been brought to a stop, were observed to be cut and bruised as if by the flange of the wheels of the engine and tender.

Though the plaintiff omitted from his petition filed in this case, the allegation that this "U. L." car was broken down and caused the wreck on account of the rapid and dangerous rate of speed at which the train was being run at the time of the accident, as he had alleged in his first petition filed, he was made to say on cross-examination in this case, that he had said and thought the train was going too fast, and was being run at a rate of speed that was dangerous when the accident occurred, and that he thought the train in consequence of its speed would go into the ditch. The plaintiff also said that when the train was running down the steep grade upon which it wrecked, the steam from the boiler was not turned off, but was being used on the engine.

While at the former hearing of this case, the writer was inclined to the view (then presented with much earnestness by counsel for defendant) that the plaintiff had not shown as charged in his petition, that the sills of this "U. L." car that broke in two, were doty or worm-eaten, other than as those defects were made to appear from the breaks in the sills themselves, which ordinary inspection would not have revealed before the break occurred, in the trial of the present case, the testimony upon the question of the defects in the sills, and the extent and character of those defects was gone into more fully than at the first trial of the case, and several witnesses called by plaintiff, who made an examination of the wreck within a few minutes after its occurrence, testified that the sills of this "U. L." car which they found broken in two upon the track, were decayed, doty and worm-eaten, and that this defective condition of the sills could be readily seen (except on the two outside

sills that were painted), for four or five feet on either side of the break in the sills, as well as at the point of the breaks, and that same could be readily observed by anyone making an examination of the car standing 6 or 8 feet distant from it, 1 am now of the opinion that at the present hearing of the case, the plaintiff offered ample testimony, if believed, to authorize the jury to find for him on the allegation of his petition that the sills of this ''U. L.'' car were defective, and that by the exercise of ordinary care and inspection their defective condition could have been known to defendant, if upon all the testimony in the case, there were facts or circumstances shown, calling for the determination of a jury upon the remaining issue in the case, that this car by reason of its defective condition, broke down upon the tracks and caused the wreck of defendant's train, upon which plaintiff was riding at the time of receiving his injuries.

What then are the facts of the case upon this last issue to justify its submission to the determination of a jury? That the plaintiff was badly injured by the wreck that occurred, is sadly too true, but as to the cause of the wreck, as to the averment that this ''U. L.'' car broke down upon the track and thereby caused the wreck of the train upon which plaintiff was at the time riding, there is a total absence of fact in this entire record, or of facts from which the inference may fairly or reasonably be drawn, that the breaking down of this car upon the tracks was the proximate cause of the wreck that resulted in plaintiff's injury.

In fact, if the testimony from the mouth of plaintiff himself, to the effect that he thought this train would be ditched on account of the dangerous and rapid rate of speed at which it was being run down grade with steam on, at the time of the accident; or if the testimony of the other two eye witnesses to the occurrence, plaintiff's two fellow brakemen (one called by plaintiff and the other called by defendant) to the effect that this ''U. L.''

car "was whole when it left the track and the damage to it was caused afterwards," is given any consideration, we must conclude that the proximate cause of the wreck of this train was something other than the breaking down upon the track of this "U. L." car on account of its defective sill timbers. If the train upon which plaintiff was working was wrecked on account of the dangerous and rapid rate of speed at which it was being run by the engineer in charge thereof, then plaintiff has shown himself not entitled to recovery even though the sills of this "U. L." car were confessedly defective, and were found to have broken in two after the car left the iron rails of the track upon which it was designed to run.

If this "U. L." car jumped the track while it was yet in perfect condition, and was pulled over and along the cross ties on the road bed before it turned over, or was broken in two and fell down upon the track, as the brakeman on the train, called by plaintiff, and the one called by defendant, to narrate the facts as seen by them, said it did, and as the bruised condition of the wooden cross ties under and immediately back of this wrecked "U. L." car clearly indicated the fact to have been, then the proximate cause of the wreck of this train was not that this car broke in two and fell down while being run upon the track, but the cause was that this car had for some reason jumped the track, or that the tracks had spread and let its wheels through upon the cross ties, or had for some other cause unsuggested by witness, left the track on which it was designed to run, and was broken down by being pulled over the rough and uneven surface of the wooden cross ties. All the positive testimony offered by plaintiff upon the question as to the manner of the occurrence that led to the wreck, not only failed to establish the allegation of his petition, but absolutely disproved their existence if believed, and we think the physical manifestations of the wreck itself are no less convincing upon this proposition, than the

declarations of the eye-witnesses of the occurrence, however short all these facts may yet be of furnishing the information by which the true cause of the wreck may be determined.

If this "U. L." car did jump from the rails of the track before it broke in two, or if it was let down upon the cross ties of the roadbed, because of a spreading of the iron rails forming the track upon which the car was designed to run, then the fact that this car at the time had doty and worm-eaten sills, became a matter of no concern in this case, for the twofold reason: first, because there is nothing in the existence of doty or worm-eaten sills in a car, so long as the car remains whole and unbroken, to cause it to jump a track upon which it is being pulled, or that would cause, or have any tendency to cause, the wheels of such a car to leave more readily a track that had been spread too wide for its trucks, than if the sills had been absolutely sound and perfect; and in the second place, if this car jumped from the iron rails forming the track, or if for any reason its wheels fell through and down upon the wooden cross ties of the roadbed when the train was being run at the rate of twenty or twenty-five miles an hour down a steep grade and around a sharp curve in the track, a wreck was inevitable, whether the sills of this car were sound or defective, and the condition of the sill timbers of the car and the manner of their breaking in two are to be considered as mere incidental facts of the wreck resulting from some primary original cause to be yet ascertained. Cars are not constructed to withstand the strain and force to which they are subjected under such conditions. Good sill timbers and bad sill timbers, in the cars of a train running at the rate of speed this train was then going, when the train for any reason leaves or jumps the track, are alike broken and smashed into splinters, as the physical condition of most of the cars of this train, as well as the "U. L." car, clearly demonstrate. If it is once recognized that this "U. L." car

was off of the iron tracks and running upon the wooden cross-ties when it was yet whole, how it was torn up or broken in two when afterwards examined, is to be studied as a mere incidental result of the wreck, and throws no light upon the inquiry as to the cause thereof.

But it is said for respondent that the situation and condition of this "U. L." car upon the track tells its own story of the cause of the wreck, independent of and contrary to what his witness, Hessler, said upon the subject, and contrary to plaintiff's first version of the cause of the wreck as he determined it from the top of the car upon which he was riding at the time of the occurrence. If, then, resort is to be made to the doctrine of *res ipsa loquitur,* to show the existence of this last essential averment of fact of plaintiff's petition, as plaintiff was compelled to do in the present trial after he repudiated and abandoned as untrue not only his own original judgment as to the cause of the wreck (the rapid rate of speed of the train down grade on a curve with steam on), but all the positive testimony regarding the occurrence as given by his eye-witness Hessler, it is certainly not proper that we confine the inquiry to the simple story told by this "U. L." car itself standing alone and disassociated with all other features of the wreck, but we should at least view and study the situation and condition as shown by the entire wreck and all the surroundings, and ascertain, if we can, from these, the full story of the wreck and the cause that led thereto if possible. Not only this "U. L." car but all others of the 10 or 12 cars that were found piled upon the tracks back of this car, broken and piled up, some five or six of which, were as badly or more jammed and broken up than this "U. L." car, upon which counsel for plaintiff now seek to fasten the sole cause of the wreck, must be called to bear witness if we may expect even a possible correct disclosure of the cause that led to the wreck. Not only these wrecked and broken cars, but the condition of the broken and bent rails of the

track under these cars, as seen by the witnesses called
to reproduce by verbal photograph the situation to the
jury, must be studied; and the fact that the iron rails of
the track were found badly disordered and spread apart
in places wide enough to permit the wheels of the trucks
of the cars to drop down upon the wooden cross-ties of
the roadbed, and the fact that the wheels of the tender
and engine of this train (except the two front wheels of
the engine) were also found off the track a hundred
feet or more distant down the road from these wrecked
cars, and also the fact that the wooden cross-ties along
the track for some distance from where the engine and
tender stopped, as also for several feet back from where
this "U. L." car was broken down, were found to be
cut and bruised as if by some heavy object running
over them, and all other conceded and well recognized
facts of the situation must be taken into account, if the
manner of the occurrence of the wreck and the causes
that led thereto, is expected to be determined from the
physical facts of the wreck itself, by any kind of a fair
conjecture even; and if the story as told by the consider-
ation of the one feature or condition of the wreck, which
may now be suggested by plaintiff, as the cause thereof,
is out of harmony and irreconcilable with that told or
indicated by the consideration of other conditions and
features thereof equally as obvious and quite as sug-
gestive of a different or contrary cause, that might have
brought on the wreck, the court should act as upon the
irreconcilable story of any single witness who is called
to establish the existence of any essential averment of a
petition, treat it as if nothing substantial had been
shown in the case.  Under such circumstances there is
nothing for the determination of a jury.  To permit a
jury to enter the field of conjecture under such circum-
stances, to say which of these physical conditions they
would consider and which they would reject, would be
no less unreasonable than to permit a jury to take a case
for determination where an eye-witness to the occur-

rence who had been called by plaintiff to prove the averment of his petition, after first telling what he had seen in line with the averments of the petition, had, when asked by the defendant to repeat what he had seen and the manner of its occurrence, made an exact contrary statement.

Upon the testimony of a witness to antagonistic and irreconcilable statements of a fact, one tending to sustain the allegations of a petition, the other to disprove it, no one would contend for a moment that the case was one for the determination of a jury. Until a witness can determine for himself just what he saw or did not see, a jury is not warranted in making the determination for him. Under such circumstances the court should dispose of a· case as if the witness had not spoken; as if plaintiff had offered no proof upon that averment of his petition. So here, if the conditions and the appearance of a part of this wreck (to which plaintiff has been driven as his only availing witness, to establish the averments of his petition) might reasonably indicate when standing alone, as plaintiff now contends the appearance and position on the track of this broken "U. L." car does, that it broke in two and fell down upon the track and thereby caused the wreck which resulted in his injury, there was yet no warrant for the jury taking these facts and from them alone making a finding in accordance with plaintiff's present theory as to the cause of the wreck, when other features and conditions of the wreck disclose a state of facts which as clearly indicate that the wreck must have occurred in a different manner, and could not have occurred, as respondent contends the appearance of this "U. L." car upon the track might and does indicate, if considered alone. The court under such circumstances should act as upon the irreconcilable testimony of any single witness offered to prove the existence of any given act of negligence—tell the jury that plaintiff had failed to make out his case. If the wreck itself, that is,

if all the broken and mangled cars of that train, and the condition of the tracks and roadbed under the cars and the fact of the engine being off of the iron track in advance of this "U. L." car, is to be relied upon to tell the cause that led to the wreck, there should certainly be exacted of all these features of the wreck so examined, as of any witness called to establish the existence of the same fact, that they tell one uniform and consistent and reconcilable story.

If the conditions and appearances of this "U. L." car when considered alone might indicate, if it might suggest, or if we may use the term, if it might tell one story when considered by itself and independent of the other features of the wreck, of how the wreck may have been brought about; and if another feature of the wreck when studied alone tells a different story of how the wreck might have taken place, and what was its cause, and still another feature of the wreck would indicate that it must have occurred from an entirely different cause, some of which causes suggested would render defendant liable and others not, what was plaintiff's authority for selecting the one feature of the wreck he did to the exclusion of all others, or why did he not take the condition and appearance of some one of the other 8 or 10 broken and shattered cars of that wreck, or why did he not consider the feature of the disordered condition of the iron rails of the track, under this wreck, or the condition of the bruised and battered wooden cross-ties at that point or any one of a dozen or more features of the wreck, all of which were as open to the view as the condition of this "U. L." car?

If the truck of the engine used to pull this train, jumped from the iron rails of the track on that occasion (and according to every witness who spoke upon that subject, they did at some time during the progress of the wreck) and if it was due to the rapid rate of speed at which the train was being run down grade and around a sharp curve in the road with steam on (and

this was plaintiff's first opinion as to the cause of the wreck, as he was able to observe it, from the top of one of the cars of the train) and if the engine pulled or jerked this "U. L." car off after it upon the wooden cross-ties where the car then broke in two and fell down upon the track, the primary cause of the wreck that injured plaintiff was that the locomotive engine first jumped, or, for some cause, left the iron tracks upon which it was designed to run. The broken condition of the sill timbers of this "U. L." car, as that of the broken condition of the timbers of the other eight or ten wrecked and smashed up cars of the train, under such circumstances, should then also be considered as mere incidents of the wreck, and not looked to as the cause thereof. Or if this "U. L." car itself jumped from the iron rails of the track upon which it was running to the rough and uneven surface of the wooden cross-ties of the roadbed, on account of the dangerous rate of speed of the train, before the engine and tender left the track, or if it left the iron rails of the track on account of their disordered and disturbed condition (a feature of the wreck plainly observable to every witness who spoke upon the subject), and was broken in two and fell down upon the tracks on account of the unusual strain to which it must necessarily have been subjected by being pulled over and across the wooden cross-ties while it was out of line with the engine and tender in front, and the car in the rear, to which it was attached by iron links or fastenings, the fact that the sill timbers were found to be doty, worm-eaten, rotten and broken in two, are to be considered as incidental conditions seen in a catastrophe inevitable from some prior efficient cause. Or if this "U. L." car jumped from the iron rails of the track upon which it was designed to run, or fell through the iron tracks to and upon the wooden cross-ties of the roadbed for any cause or causes known or unknown, and was pulled over the rough uneven surface of the wooden cross-ties at the rate of 20 or 25 miles an hour,

while it was yet in perfect condition and before it was broken in two and fell down upon the tracks, as plaintiff's only eye-witness to the occurrence says it did, and as the marks on the cross-ties clearly indicate the fact must have been, the plaintiff must fail in his cause of action as at present brought.

Or if the battered and bruised condition of the wooden cross-ties for forty feet or more back of where this "U. L." car was found in the wreck, is studied, a story is told of what must have occurred at the wreck that absolutely disproves respondent's present theory of the cause of the wreck, and is quite in harmony with the story told by plaintiff's witness Hessler, to the effect that this "U. L." car had jumped from or fell through the iron rails of the track to the wooden cross-ties and was running upon them before it broke in two and fell upon the track.    It would be a fair and reasonable presumption and one which the law might permit to be indulged from the sight of this wrecked "U. L." car, and the bruised and battered condition of the wooden cross-ties, for a distance of 40 feet or more back of where said car was found broken down upon the track, to say, that either this "U. L." car or the engine and tender in front of it, or all of them, had jumped from the iron rails of the track to and upon the wooden cross-ties, and thus cut and bruised them with the partially sharp flange of their wheels, before the "U. L." car broke down upon the tracks, for after this car broke in two and the sills under the rear portions thereof fell upon the track, every circumstance in the case points to the fact, and plaintiff claims the facts to be, that this rear portion of the car moved forward only five or six feet upon the track before it was brought to a complete stop (evidenced by the marks upon the roadbed and ties, made by these broken sill timbers plowing over them for that distance after the car broke in two and dropped down upon the track).

As said before, if this "U. L." car or the engine

and tender in front of it, did for any cause jump from or leave the iron rails of the track upon which the train was running, before this "U. L." car broke in two and fell down upon the tracks (as the bruised condition of the wooden cross-ties clearly indicate the fact must have been) the cause of the wreck did not take place as plaintiff asserts, but is to be attributed to that fact rather than to the doty and decayed sill timbers of the "U. L." car that were found broken in two in the wreck. The condition of the sill timbers of this "U. L." car and its position upon the track, as that of all the broken timbers in all other of the wrecked cars, became as mere incidental facts seen in a wreck.

When a physical condition or fact shown is alone relied upon to prove the existence of a certain other fact or facts asserted as the basis for a cause of action (as plaintiff was driven to do in this case, after rejecting and repudiating as untrue the oral statement of his only eye-witness to the occurrence, his fellow brakeman Hessler, who said that this "U. L." car broke down after it jumped or left the track, and after discarding his own first impression as to the cause of the wreck, the rapid rate of the train's speed on a sharp down grade curve in the road), the fact asserted and sought to be proven must be one which uniformly, regularly and naturally precedes the existence of the facts shown. It is not enough that we may say, the condition shown has a tendency to prove, or to suggest, the prior existence of the fact asserted and sought to be proven equally with other facts as reasonable and readily suggested to the contrary, and particularly is that so, where some of the conditions shown might indicate the happening of the wreck from a cause or causes for which the defendant would not be liable equally as readily as for a cause or causes for which it would be liable.

But as before said, when every feature and condition of this "U. L." car and the entire wreck as detailed by all the witnesses, is considered, whether sepa-

rately or collectively, we have yet nothing that can be said to furnish more than material for conjecture as to what was the primary or proximate cause that led to the wreck, that resulted in plaintiff's injury; and this surmise or conjecture, now made in behalf of plaintiff (for such only can it be characterized) not only fails to coincide with plaintiff's first opinion as to the cause of the wreck, but is in absolute conflict with the view as expressed by the only two eye-witnesses of the occurrence who testified in the case.

For plaintiff in this case the error has been made throughout of assuming instead of proving the existence of the very fact assigned as his cause of action. Thus it is said: "certain it is if the timbers of this car [the "U. L." car] were rotten they were liable to break from that fact. Therefore given the rotten timbers, the broken car and the wreck, what more is needed to make out a prima facie case for plaintiff?" And again it is said, "If the timbers of this 'U. L.' car were doty and worm-eaten, if they broke in two, dropped down, plowed into the roadbed and formed a barrier against which the rear cars of the train were thrown, the jury needed no expert testimony to assist them in finding the cause of the wreck." Had plaintiff been a passenger upon defendant's train riding in a place assigned to him by defendant's authorized agents, the fact of the wreck, and the existence of the decayed sill timbers of this broken down "U. L." car would have been ample to have raised the presumption of negligence on the part of defendant, and properly could have been declared to have made out a prima facie case for plaintiff, but not so when his relation to defendant was shown to have been that of employee to employer, and when he was at the time of receiving his injuries, one of the train crew in the actual management and conduct of this wrecked train. To maintain an action against defendant it was necessary for plaintiff to allege, as he did, the particular cause of the wreck, and it was necessary that he prove

the cause as alleged either directly by witnesses who saw the occurrence, or by proof of facts and circumstances from which the existence of the alleged cause might fairly and reasonably be inferred. Granting that the broken sill timbers of this "U. L." car were found to be doty and worm-eaten, as plaintiff's witnesses who examined them immediately after the wreck say they were, they tell no more the cause that brought on the occurrence of the wreck that resulted in plaintiff's injury, than the broken sill timbers, seen by those same witnesses and many others, under the eight or ten other wrecked and broken cars of that train. Each tells the story that some unusual and violent energy was applied to effect their destruction, but what caused the application of that unusual force to be exerted as it was, the one car is alike as silent as the others. The broken, decayed sill timbers of this "U. L." car and the broken sound timbers of the other 8 or 10 cars of the wreck, are alike but incidents found in a wreck, but neither of itself nor all together tell a story that would warrant more than a conjecture to be made therefrom. Plaintiff having failed to establish by adequate proof the existence of the essential averment of his petition, that the wreck of the train upon which he was injured was caused by the breaking down upon the track of this "U. L." car, the judgment must be reversed, and it is so ordered.

*Marshall, Burgess* and *Fox, JJ.,* concur; *Brace, Gantt* and *Valliant, JJ.,* dissent.

## DISSENTING OPINION.

VALLIANT, J.—Plaintiff was a brakeman on a freight train of defendant, and received severe injuries in a wreck of the train. He sues for damages, alleging that the wreck was the result of defendant's negligence in placing in the train a car marked "U. L. 7919," which was "unfit for service, unsafe, old, worn, and out of repair, and timbers of which were decayed and rotten, worm-eaten and doty;" that the defendant knew or

by the exercise of ordinary care might have known the condition of the car. The answer was a general denial of the averments of negligence.

On the trial the evidence on the part of the plaintiff tended to show as follows:

In the train in question there were 18 loaded cars and three or four unloaded. The "U. L." car No. 7919 was the first in the train, and was coupled to the tender. Plaintiff was one of the brakemen, his station being forward of the others. The train had left Kansas City that morning and was headed for St. Louis. After passing Independence, coming east, there is a heavy up grade for a mile and a half to Elm Park, then it becomes a down grade, through cuts and curves to a point near a station called Little Blue, which is about seven miles east of Independence. This train was to side-track at Little Blue to let a passenger train that was coming, pass; it had pulled up the grade, passed the summit at Park View, and was on the down grade going twenty to twenty-five miles an hour, and the engine had about reached the bottom of the hill one mile west of Little Blue when the wreck occurred. There was such a noise produced by the crushing of the cars in the wreck that people living in the neighborhood were attracted to the scene, and this is what they found: The front car, the "U. L." car in question, had broken in two; the front part, about one-third, was still coupled to the tender and was off the rails to the right, partly on and partly off the roadbed, and about sixty or seventy feet from and in front of the other end of the car. The wheels of the tender were off the rails and so were those of the engine, except the two front small wheels. The rear end of the car was on the track coupled to the next car behind, its sills had broken in two, the broken ends had dropped down and plowed into the track, forming a barrier against which the rear cars crushed and broke, some falling to the right and some to the left, demolishing the whole train except the last two or three cars.

The plaintiff was found under one of the wrecked cars, his limbs broken and mangled and his flesh torn in a very severe manner.

The plaintiff's testimony further tended to show that this car was old and unroadworthy, its sills were rotten, worm-eaten and doty, and had broken squarely in two, the iron truss rods had pulled the nuts through the cross sills at the front end of the car and had remained unbroken.

It was stipulated by the parties that this "U. L." car was received in Atchison, Kansas, December 5, 1892, having come over defendant's road from St. Louis loaded with 31,300 pounds of nails, and that it remained in Atchison unloaded from that date until December 10, 1892.

The testimony on the part of the defendant tended to show that the car was sound, in good condition and comparatively new; that it was built to carry 60,000 pounds, that it was in this train loaded with 30,000 pounds of barreled flour; that it had been inspected and no defect was noticed; that the train was running twenty to twenty-five miles an hour, that when the engine stopped it was 100 or 200 yards in front of the wrecked cars; that this car did not break in two before it left the track, but went off whole and rolled down the embankment.

At the close of the plaintiff's evidence and again at the close of all the evidence the defendant asked the court to instruct the jury that the plaintiff was not entitled to recover, which instruction was refused and exception duly taken. The cause was submitted to the jury under the following instructions requested by the plaintiff:

"1. The court instructs the jury that if you believe from the evidence in this case that, at the time of the wreck of defendant's train, the timbers of the car No. 7919 Union Line, mentioned in evidence, were rotten and decayed and that, by reason thereof, the said

car was not in a reasonably safe condition for use in defendant's said train; and that defendant knew of or by the exercise of ordinary care might have known of the condition of said car and that by reason of the said condition of said car, if the jury believe from the evidence it was in such condition, the said car broke and the said train was wrecked and plaintiff while in the line of his employment and without fault on his part, was injured thereby, the jury must find for the plaintiff. And the jury is instructed that ordinary care as used in these instructions means such care as an ordinarily prudent person would exercise under the circumstances detailed in evidence.

"2. If the jury find for the plaintiff, in estimating his damages they will take into consideration, not only his age, the physical injury inflicted, and the bodily pain and mental anguish endured, but also any and all such damages, if any, which it appears from the evidence will reasonably result to him from said injury in the future, not to exceed in all the sum of $25,000."

At the request of the defendant the court gave fifteen instructions, which it is unnecessary to set out here and refused two, which will be referred to later. There was a verdict for the plaintiff assessing his damage at $15,000 and judgment accordingly, from which the defendant appeals.

A suit between these parties, growing out of the same matter, has been in this court before: Oglesby v. Mo. Pac. Ry. Co., 150 Mo. 137. In that case there had been a judgment for the plaintiff which this court reversed, and remanded the cause for a new trial. After the cause was returned to the circuit court the plaintiff dismissed that and instituted this suit. In the former case the petition alleged the cause of action the same as in this case, and in addition thereto alleged that the train was run at a dangerous speed. The testimony on that point was that the train was running twenty or

twenty-five miles an hour, but it was there contended that the statement in the petition was conclusive against the plaintiff. That point is discussed in the opinions in that case. There is no such averment in this petition and the evidence as to the speed of the train is the same now as it was then, twenty or twenty-five miles an hour. There was no effort to show that that was an unusual or dangerous speed.

It was contended in the former case, and is contended here, that even if the car was defective in the manner alleged, still, if the defendant used ordinary care to inspect it and did not discover the defect, it is not liable. There was some testimony in the former case on the part of the defendant relating to the matter of inspection, and a reference to the report shows that the members of this court were divided on the question of whether that evidence was conclusive in favor of defendant requiring that the case be taken from the jury. There is more evidence on that point in the record now before us than in the former case.

The main insistence of appellant now is, as it was in the former case, that there was no evidence which justified the submission of the case to the jury.

In analyzing the argument for appellant on this point, it seems to be based on these propositions, viz.: That the train was running at a dangerous rate of speed, and therefore it was the negligence of a fellow servant; that there being no charge in the petition that defendant employed incompetent inspectors, and the evidence of defendant showing that the car was inspected, defendant is not liable if the inspectors negligently performed their duty, because they were the plaintiff's fellow servants; that the car did not break in two before leaving the track, but went off whole; that plaintiff's evidence fails to show what caused the engine and tender to leave the rails.

I. The defendant took the position at the trial, and takes the position now, that the burden is not on it to

show how the accident occurred; that the plaintiff must show that it resulted from the rotten condition of the car and its breaking in two, and the argument seems to go so far as to say that it devolves on the plaintiff not only to show that the car broke in two on account of its defect, and formed a barrier against which the rest of the train beat and broke, but that the plaintiff had no evidence to go to the jury until he had also introduced evidence to show how the wheels of the engine came to be derailed.   But whilst insisting that it is not bound to account for the accident it does argue that the result was produced by excessive, dangerous speed of the train, and that is the only theory advanced.   In the opening argument to the jury, the learned counsel said: "The evidence will show that this train with about eighteen cars coming down that grade at a rapid and dangerous rate of speed, attempting to place itself beyond the reach of the passenger train that was coming from Kansas City to St. Louis, and this plaintiff and the others were making an effort to get to that side track and out of the way of that train, and that they were all negligent in running on the passenger train's time and undertook to make the side track. . . . They were running contrary to orders, at any rate they were required to keep out of the reach of the passenger train and the train crew concluded they had to run at a rapid rate of speed." In the brief now before us in support of that proposition, reference is made to the allegation in the petition in the other suit, to the effect that the train was being run at a rapid and dangerous speed, and plaintiff's evidence in the trial of the other case on that point, was read, wherein he said that the steam was not shut off, and that he thought the train was running too fast, but that he had not been on the road long enough to tell how fast the train was running.   The evidence showed he was then nineteen years old.   That is the only theory defendant has advanced to account for the accident, and that is the

only evidence upon which that theory is based. All of the defendant's own evidence as to the speed of the train was that it was running twenty to twenty-five miles an hour, and there is not a word of evidence to the contrary. The conductor testified that they were not trying to make up lost time, they were within a half mile of the side-track where they were to wait for the passenger train. In addition to this the time card which counsel for defendant admitted was correct, showed that the speed testified to by the defendant's train crew was within the schedule time prescribed for this train. In commenting on the evidence of their own witnesses on this point, counsel for appellant in their brief say: "The defendant's servants, when testifying, were attempting to protect themselves as far as possible from the imputation of running on passenger train time, and running at a rapid rate of speed, for the obvious reason that they did not desire to take chances on losing their positions, by reason of their being charged with personal negligence in running said train too fast."

In the face of that evidence it is argued that the case should have been taken from the jury on the ground that the wreck was caused by the negligence of a fellow-servant in running the train too fast. Suppose there had been a passenger in the caboose, and he had been injured, and in a suit for damages against the defendant in attempting to prove negligence, he had introduced evidence only to the effect that the train was running twenty or twenty-five miles an hour, what would have been the result of his case? There is no foundation in this evidence for attributing the accident to a negligent speed of the train.

In the brief for appellant it is said: "It is not charged or claimed in petition that defendant's inspectors were incompetent. Hence, if these inspectors were guilty of personal negligence in not properly inspecting said 'U. L.' car, the plaintiff is not entitled to recover, as he and said inspectors were fellow-servants."

If that were the law then a railroad company could never be held liable for an injury to one of its employes engaged in operating a train, on account of defective cars or engines. And no other master, except perhaps one whose machinery was so limited in size or quantity as to come under his own eye for inspection, could be held liable to his servant for defective appliances. The work of inspecting cars is not performed by the officers or directors of the corporation, nor by its superintendents or other like superior employes or agents, but the work is of a character to be performed, as the evidence in this case shows, by ordinary employes, men filling the legal definition of servants. If, therefore, we say that the servants of the corporation whose duty it is to inspect the cars and see that they are reasonably safe to be sent out on the road, are fellow-servants of those who go out on them, we may as well say to a servant injured by a defective car or engine, you must look to the inspector alone for redress of your injury, because he is your fellow-servant, and therefore your master is not liable. That is not the law.

In Long v. Railroad, 65 Mo. 225, this court expressly held that the inspector of the car was not the fellow-servant of the brakeman. In Bowen v. Railroad, 95 Mo. 268, which was a case of master and servant in which the accident was caused by an alleged defective bridge, the court, per BLACK, J., said: ''For like reasons the defendant did not perform its whole duty by furnishing a competent bridge inspector. It was its duty to see that the bridge was properly inspected, and that, too, considering not only the fact that it was used for the passage of trains, but that it was used in operating a pile-driver therefrom.'' The principle that should govern us in determining whether the relation of fellow-servant in such case exists, is clearly expressed in Schaub v. Railroad, 106 Mo. 74, by GANTT, P. J.

''It is conceived that much of the apparent conflict

in the different cases, on the liability of the master to his servant for the negligent acts of other servants, grows out of the failure to keep in view those personal duties which the master himself owes to his servants, as distinguished from those they owe each other. For failure or negligence in the discharge of these personal duties of the master resulting in injury, the master is liable whether he acts in person or by other servants. If he acts by servants in such cases, it makes no difference as to the grade of the servant. The servant is identified with the master. The master's duties are cast upon him and for his default the master is liable, and in these cases the doctrine of 'fellow-servants' so called, has no application whatever. In this class of duties, it has long been established, that a railroad company, as a master, owes to its employes to keep its road and works and its track in such repair as to insure the safety of its servants, who are required to work, and be on its tracks, and it is bound to furnish safe and sufficient machinery and cars. This duty it cannot delegate to any servant, high or low, so as to escape liability. [Lewis, Admr., v. Railroad, 59 Mo. 495; Hall v. Railroad, 74 Mo. 298; Siela v. Railroad, 82 Mo. 435."]

The duty of furnishing reasonably safe cars for its trainmen to handle is a duty of the railroad company which the law imposes, and will not allow the responsibility to be shifted to a servant. The work is to be performed by a servant, but the servant in performing it represents the master. In Rodney v. Railroad, 127 Mo. 676, speaking of a car that had been inspected, condemned and ordered to be taken out of the train, but the order was disregarded, this court, per BRACE, J., said:

"Herein lies the vice of the whole argument. The defendant did not discharge its full duty to the plaintiff by inspecting and marking the car. The duty to furnish reasonably safe appliances and machinery for the

use of its servants in the course of their employment was not only an imperative but a continuous duty. It ran, so to speak, with the defective car from the moment it was discovered to be defective, continually calling upon the master to repair it, or to warn those of its servants whom it required in the course of their employment to handle it of its dangerous character. These duties were not only imperative and continuous, but they were personal duties of the master, to whomsoever delegated, and if neglected by those to whom they were delegated, their negligence was the negligence of the master.''

In Grattis v. Railroad, 153 Mo. 380, the contention was that as to the engineer and fireman, the conductor was the vice-principal of the master, but the contention was not sustained, and in the opinion by MARSHALL, J., wherein all the previous decisions of this court on that subject were reviewed, it was said: ''But where the master's business increases, and becomes more extended, and spreads out into many places, and, perhaps, over many States, so that the master can not be always present in person to direct or hear reports from his servants, it is, of course, necessary for him to have some one on the spot to represent him, an *alter ego* or vice-principal, it is called, who shall have the right to speak for the master, and in such cases such person's acts are the acts of the master, and he is liable to the servant for injuries received through his negligence, the same as if the master had been present, acting himself.''

The inspectors were not simply engaged in promoting the master's work, but they were engaged in performing a duty that the master owed to his servant and in that respect they represented the master.

The defendant was not entitled, therefore, to have the case taken from the jury on the ground that the inspectors were fellow-servants of the plaintiff.

What the evidence showed in regard to the care

that was exercised in the inspection of this car will be hereinafter referred to.

When the people in the neighborhood who were attracted by the great noise of the wreck arrived on the scene, they found this "U.L." car broken in two, the rear end of it on the track, coupled to the car next behind, its sills broken in two, the front ends of the sills dropped down and plowed into the road bed, forming a barrier against which the other cars in the train had crushed and broken. The front end of the broken car still coupled to the tender was off the track to the right, the wheels of the tender were off the rails and the wheels of the engine (except the two small wheels in front) were off the rails, but, as one of defendant's witnesses, the foreman of the wrecking crew, said, they were "just close up against the rail, just about hugging the rail." There is no contradiction in the evidence that that was the situation when the witnesses first viewed the wreck. There is some difference between one of the witnesses for plaintiff and one of defendant's witnesses as to the space between the front end of the broken car attached to the tender and the rear end of it still on the track, but neither witness professed to speak accurately on the point, and it is of little importance. The situation in the main as described by the plaintiff's witnesses is uncontradicted.

When these people saw the car broken in two, one end some distance ahead coupled to the engine, the other on the track in the condition above mentioned, forming a barrier and the other cars piled up in a wreck behind it, they naturally concluded that it was the breaking of the car that caused the wreck, and that led them to examine the timbers of the car to see if they were sound. The question is asked, why did they not examine the other cars, which were as badly broken as this one? The situation itself explained the breaking of the other cars. Had a barrier of sufficient strength as suddenly dropped down, in front of the en-

gine, as did the barrier in front of these cars, the engine, tender and cars would all have crushed and broken against it.   When a train of loaded cars running twenty miles an hour strikes such a barrier and is wrecked, no one, seeing the barrier, would think of examining the cars behind it to learn the cause of the wreck.   So it did not occur to any of the witnesses, either those of the plaintiff or those of the defendant, to examine the other cars.   They found a broken chain and they examined the broken link.   The witnesses for the plaintiff who made the examination were disinterested men, their evidence shows that they were men of intelligence, and there is nothing to justify a suspicion that they were not fair and honest.   They testified that the sills of the car were worm-eaten, rotten and doty, and that they broke squarely in two as rotten timbers will.   The theory of the defendant seems to be that the cause of the wreck is inscrutable; it asked some of its witnesses as experts what in their opinion caused the wreck and they all answered that they did not know.   If the testimony of the plaintiff's witnesses is worthy of belief, if the timbers of the car were rotten, if they broke in two, dropped down, plowed into the track and formed a barrier as those witnesses testified, the jury needed no expert testimony to assist them in finding the cause of the wreck.   It was a question of fact appealing to the common sense and honesty of the jury.

But there was testimony on the part of the defendant tending to show that this was a comparatively new car, only five or six years old, and sound in all its timbers; that its registered capacity was 60,000 pounds, that after it had been in use for a short while its strength was fortified by putting in it what was called a Graham draft; that it had come over defendant's line from St. Louis to Atchison, Kansas, loaded with 31,800 pounds of nails, that it remained in defendant's yards at Atchison from December 5th to December 10th, when it was

reloaded with 30,000 pounds of barreled flour and sent out on this trip.

It was within the province of the jury to have found in this conflict of evidence that the timbers of this car were sound and that it had no defect, and so finding, the verdict would have been for the defendant. But the jury did not believe that evidence. It was for them to say which evidence was the more credible, and they gave the credence to the plaintiff's witnesses. It is not for an appellate court to weigh conflicting evidence, to ascertain where the preponderance is to be found. But since the charge is made, that the testimony is so overwhelmingly in favor of the defendant that the verdict of the jury can be accounted for only on the ground of prejudice or passion, we will look at it to see if that charge is justified. In the first place, by reference to the report of the former case (to which counsel on both sides refer) we see that substantially the same evidence has been weighed by two juries. who have reached the same conclusion, and their verdicts have been approved, respectively, by two circuit judges.

The plaintiff's witnesses to the unsound condition of the car were men living in the neighborhood who were attracted to the scene by the noise. They examined the timbers immediately after the wreck. There were six of these men. They had no interest whatever in the case, their testimony was straightforward and intelligent. In addition to those men was a man named Lafferty, who had been in the railroad business several years, serving at different times as brakeman, fireman, and at repairing cars, and who at the time of the accident was in the employ of defendant company as station baggage agent at Independence. This train stopped at Independence, and this man saw it. He testified that he noticed that this car sagged in the middle. He was at the scene of the accident very soon after it occurred, examined the timbers of the car and found them rotten. On cross-examination he said that he thought the car

in a dangerous condition on account of the sagging, but did not mention it to any one on the train, because he did not regard it his business to do so. Upon this the counsel for appellant in their brief say: "We insist that this witness is either a colossal liar or an inhuman wretch." But if one of the defendant's witnesses, Davis, a car inspector, is to be believed, Lafferty's failure to mention to any of the train crew the dangerous condition of the car was not surprising or deserving of such strong condemnation in view of the custom of railroad employees in such case. This man Davis was called by defendant as an expert car inspector, and this is part of what he said: "Q. When you see a car sag, what do you do? A. It is marked and sent to repair track. Q. It ought not to go out, ought it? A. That car is perfectly safe to run, if it is sagged. It will only go so far, and then stop. Q. If it is just as safe when sagged, what is the use of keeping it up at all? A. You want to get your car empty and then take it to the repair shop. Q. It would need repairing if it sagged? A. It would need tightening up, but you would not want to delay it when it was loaded? Q. You would take the risk and let it go? A. Yes, sir, take the risk. Q. But that car needs repairing, doesn't it? A. Of course."

Defendant's evidence to show that the timbers were sound consisted of the deposition of a witness in Indiana, who was superintendent of motive power of the Pennsylvania railroad, who attached to his deposition the original plan and specification on file in his office, under which, he said, the car in question had been built, and he testified that according to the specifications nothing but sound timber was allowed to go into the car, that it was not probable the timbers would rot within five years, and was not probable that they were rotten when the accident occurred; the witness did not profess to have ever seen the car. C. P. Scow, foreman of defendant's wrecking crew, went to the scene of the acci-

dent on the day it occurred. He examined the sills of this car and "did not find anything unsound about them." J. W. Welch and J. B. Donnigan, also employees of defendant, testified that the timbers were sound. T. J. Donegan, division foreman of defendant's car department, who went to the scene of the accident the next day, testified that he examined the sills of this and of the other cars and that the sills of this seemed to be in as good condition as those of any other car.

He said he went there for the express purpose of ascertaining the cause of the wreck, he found the sills of this car and examined them, and then he had them put into a pile with other stuff and burnt.

Against the testimony of six unimpeached, disinterested witnesses for the plaintiff, the jury weighed the evidence of the defendant's witnesses. They also had the undisputed fact that the car did break in two, though loaded to only one-half its nominal registered capacity. They may also have given weight to the fact that the defendant, by burning the broken sills after examining them, voluntarily destroyed the best evidence of their condition. In the face of that evidence we cannot say that it was so overwhelmingly in favor of the defendant, as that the verdict was the result of passion or prejudice.

The jury, under the instructions, must have found that the timbers were rotten, and we see no just ground to disturb the verdict on that score and *a fortiori* we cannot say the court should have taken the case from the jury on that issue.

But it is most earnestly insisted on the part of appellant that the "U. L." car did not break in two before it left the track. The court at the request of the defendant gave three instructions that required the jury to return a verdict for the defendant if they believed from the evidence that the "U. L." car left the track before it broke in two, notwithstanding they might also believe

that the car was rotten. But the jury did not believe that the car left the track before it broke in two. All the witnesses, those for defendant as well as those for the plaintiff, who undertook to describe the scene as it appeared, immediately after the wreck, said that the rear end of the car, composing about two-thirds of it, was still on the track and the other end was attached to the tender some distance ahead. How, then, could it have gone off whole, rolled down the embankment, and then immediately afterwards the parts be found as they were? But the argument is pressed that that must be so because the other two brakemen on the train, one of whom was called as a witness by the plaintiff, said it was so. Hessler, the one who was called by plaintiff, on cross-examination said: "I am pretty sure that car was whole when it went down. The side of the car was exposed to me and I could see if it broke down. We made a short curve to the east there, and it would throw me looking right, pretty near, at the side of the car at the time of the accident, and I could see that the side of the car was all right at the time she went down." Counsel for defendant pressed the cross-examination on this point. "Q. What I want you to tell the jury is what you mean by 'going down,' whether it was leaving the track or otherwise? A. I will make it plain, then. The car went over. The first I seen of it was when it went over on its side; it went over and down the bank." On re-direct examination he said the bank was six or eight feet high, and it might have been more than that. The other brakeman, Keller, who was called as a witness by defendant, did not go so far as to say the car rolled down the bank, but he did say that it went off whole. The jury did not believe that evidence, and we do not believe it; it is simply impossible that it could be so. The law does not allow a party to impeach the veracity of his own witness, even when he calls one out of his adversary's ranks, but it does not hold a party bound by everything a witness of his may say. If that

car went off whole and rolled down the embankment, it stayed there, and the rear end did not get back on the track, nor did the front end re-attach itself to the tender.

The petition charges that the defective condition of the car was known to defendant, or it would have discovered it if it had exercised ordinary care. The evidence on the part of the plaintiff to sustain that charge was that which went to show the character of the defect, indicating to what extent it was visible or discernible. This testimony tended to show not only that the car was sagged, but that the defective condition of the sills was visible from their outside. To meet this evidence the defendant undertook to show that it had used due care in inspecting the car and had discovered no defect. In this effort, however, there was scarcely any evidence at all going to show that this car had in fact been inspected. The evidence tended to prove that the defendant had inspectors, and the court at the request of the defendant instructed the jury that the law presumed that the inspectors performed their duty. The inspector at Atchison testified that his duty was to inspect the cars at the lower east yards as the trains were made up, and as they were going out and that he was on duty from 7 o'clock in the morning until 6:30 in the evening. He usually inspected 150 cars in a day. He had no recollection of this car, but if he had inspected it and discovered any defect he would have noted it in his book, and since there was no such notation he inferred that there was no defect. The defendant's record evidence of this train shows that it left the Atchison yards at 2:35 in the morning, which was not within the hours when this witness was on duty. At the trial of the former case, as the record in this case shows, the defendant read the deposition of one Caples, its Superintendent of Inspection at Kansas City, which was to the effect that one Ziegler, whose whereabouts defendant did not then know, was the night inspector at Kansas City and that his record showed that Ziegler

had inspected this train, and there being no note of a defect of this car in Ziegler's book, the presumption was drawn that he had done his duty and could discover no defect. That was the evidence upon which the defendant in the former case insisted was so conclusive that the court should have taken the case from the jury on the ground that the defendant had done all the law required to discover the defect, and could discover none.

Caples testified at this trial that Ziegler went off watch at 7 o'clock in the morning. The conductor of the train from Atchison to Kansas City, a witness for defendant, testified that the train left Atchison at 2:35 and arrived at Kansas City at 7:35 the same morning. The train sheets showed the same. Ziegler therefore had gone off watch before the train came in.

There was more evidence at this trial on this point than at the former, and it leaves the defendant with scarcely a shadow to sustain its claim of inspection. The conductor of the train testified that he saw a car repairer going around inspecting that morning in Kansas City: "Q. Did you see him doing it? A. Yes sir, I seen him going around doing it. Q. Do you know how thorough an examination he made? A. No, sir." That is all there is in this record that can be called evidence of the fact of inspection, and that is contradicted by the plaintiff's evidence. The defendant undertook to show the character of inspection that usually prevailed in its yards, and in so doing exposed the fact that it was of a very superficial character. Davis, one of defendant's experts on inspection, testified that from one to two minutes was all the time spent in inspecting a car. He said: "The men meet the train at the end of the yard and there they squat down and as the train pulls by them they can see whether there is anything down, or they can hear whether there is any flat wheels on the car, or they can see whether the truck is broken down, or anything as it passes by them." That is the same witness who said

that if it was noticed that if the car was sagged it ought to be sent to the repair track, but if it was loaded it would not be taken out of the train. This witness on cross-examination mentioned the many parts of a car that ought to be inspected, and his testimony demonstrated the impossibility of inspecting it in the time usually given to that purpose. Defendant's other expert witnesses on this point showed nothing more favorable to its system of inspection.

Even on the defendant's own evidence the jury would have been justified in finding that it had not exercised ordinary care to discover the defect. But the plaintiff had substantial evidence on that point also. This man Ziegler, who, as the defendant's chief inspector at Kansas City had testified, had inspected this train and who was one of those inspectors whom the jury were instructed that they must presume had done their duty, was found by the plaintiff and his deposition taken. He testified that it was his duty to inspect a train as soon as it came in, but that if it had to be broken up (this train was broken up) the switchman immediately began switching the cars and would not wait for him to inspect them, consequently many of them were not inspected at all, and as to those he did inspect he gave only about one minute to the car, that would give him an opportunity to see if the car was broken down, but no opportunity to inspect it otherwise; that it would take from ten to twenty-five minutes to give a car a proper inspection; that he had represented to the chief inspector that he was not given sufficient time to inspect the cars, but was told that others had done it, and he must do it. The defendant's evidence showed that this train when it reached Kansas City contained thirty-two cars.

Fitch, who had filled the positions of brakeman and conductor of freight trains, and was switchman for defendant in its yards at Atchison from 1889 to 1898, testified that when trains came in from the east (this train

came in from the east), they received no inspection at the lower yards, but were pushed immediately up to the upper yards where the conductor delivered the switch list and bills to the car clerk, who would go along the train and mark the cars by numbers to show to where they were to be switched, and as soon as that was done the switch engine began switching them whether the inspector had got through or not, the inspector would not be able to inspect the cars before the switching would begin, they would not have time to inspect all the cars. This witness also stated that the time given to each car that was inspected was from one to two minutes. He also said that a car received from a connecting line (this car was from a connecting line) was given as little repair as possible, and sent back in the condition it came.

It must be remembered that this car remained in defendant's yards at Atchison five days and therefore there was ample time to have inspected it. That it was the duty of defendant to use ordinary care to see that the car was fit for service cannot be denied. Defendant undertook to prove that it did use such care and the evidence on that point is as above stated. Whether or not there was proper inspection was a question for the jury.

Brann v. Railroad, 53 Iowa 595, was a case in which a brakeman on a freight train was injured through a defective car; the court said: "The duty of inspection is affirmative, and must be continuously fulfilled and positively performed. . . . The brakeman on freight trains and such inspectors cannot be regarded as co-employees in such sense as to prevent the former from recovering of the corporation because of the negligence of the latter." And in the same opinion it is also said: "How often or when a car should be inspected, it is not for the court to say. If it is out of repair, and thereby an employee is injured, it is for the

jury to say whether the defendant by ordinary care could have discovered the defect."

Railroad v. Mansberger, 65 Fed. 196, was a case of a brakeman on a freight train injured in an accident caused by a defective coupling pin. "The only witness who spoke on the subject said he could not say whether or not the fracture could have been seen before the pin was broken." It was contended there, as here, that the presumption was that the car inspector had done his duty, but the court said: "If we should agree with counsel for plaintiff in error that, in the absence of proof, the presumption is that the car inspector at East St. Louis inspected the foreign car having the defective pin, it would not aid their contention, because the jury had a right, from the facts before them, to reach the conclusion that, if an inspection was made, it was not made with such care and prudence as would relieve the plaintiff in error from the charge of negligence. We could not, therefore, say, if we were authorized to review the finding of the jury—and we are not—that their verdict is unsupported by the evidence."

In a like case the Supreme Court of Wisconsin said: "It (the railroad company) was bound to exercise reasonable diligence in watching its cars, inspecting them, and keeping them in repair. This duty it owed its employees." [Wedgewood v. Railroad, 44 Wis. 44.]

In Bailey v. Railroad, 139 N. Y. 302, the defect complained of was in a brake in the use of which the plaintiff, a brakeman, was injured. It was said by the court: "The absence of the pin could not have been seen by one working the brake, but an inspection of the brake from under the car would have disclosed its absence." The court after stating the duty to be to furnish suitable machinery in the first instance and keep it in repair so that the lives of its employees may not be exposed to unnecessary peril, said: "In this case the company had provided for a proper inspection, which, if it had been made, would have led to the discovery of

the defective condition of the brake at Norwood, assuming that the pin was not in the rod when the train started from that place. The rule required an inspection at that point, and if due inspection was omitted there, and the injury resulted from a defect then existing, a case was made for the jury, because the master is never exonerated by the negligent omission of subordinates to perform duties which are imposed upon him in his character as master, resulting in injury to other employees.''

In Van Dusen v. Letellier, 78 Mich. 492, defendants were manufacturers of lumber, plaintiff was an employee and was injured by the fall of a dock in use by defendants, caused by the breaking of a post which, after the accident, was found to have been weakened by dry-rot not visible on the outside. The evidence showed that defendants kept skilled and competent men to inspect the docks and repair them. The court after laying down the law that it was the master's duty to furnish reasonably safe appliances for his servants to work with, and to continually keep the same in repair, said: ''If the master can delegate this duty to an employee, and apply the doctrine of fellow-servant to such employee because he is working in and about the same business, and in the same general line of such business, as in this case, the manufacture and piling of lumber, then the employer is permitted to shirk his duty upon another, and then allowed to escape all responsibility and liability upon the plea that the person injured is the fellow-servant of his delegate or agent. The law, as I understand it, will not permit this. It is a duty the master owes, which he cannot delegate to a fellow-servant of his employees.'' The evidence for defendants in that case tended to show that the inspectors had made a careful inspection of the post that broke, but the court said whether they had done so or not was a question for the jury.

In Cooper v. Railroad, 24 W. Va. 37, plaintiff's in-

testate was a brakeman on defendant's road, and it was alleged was killed by reason of a defective hand-hold on the car. The court after reviewing very many authorities, said:

"And to guard against accidents resulting from such defects in its machinery, cars and appliances, it is the duty of the company to have the same continuously inspected by persons competent to perform that duty. And, as the company must act through its agents and employees the negligence of the employee, charged with the duty of inspection, or of the master mechanic charged with the duty of keeping the machinery, cars and appliances in repair, is *the negligence of the railroad company itself;* and a brakeman on one of its freight trains, and such inspector or master mechanic, cannot be regarded as fellow-servants, in such a sense as to prevent the brakeman from recovering of the corporation for an injury sustained by him because of the negligence of such inspector or master mechanic."

In Bowen v. Railroad, 95 Mo. 268 (the bridge case to which we have before referred), this court said: "The superintendent says he inspected the bridge three or four times each day, three times on the day it fell; and that he saw nothing wrong; and another witness says he inspected it at least twice a day. Forces of men were at work on both sides of the river and at different places on the bridge and some of these inspections were made in going from one place to the other to give directions; and whether those inspections were made with reasonable care was a question for the jury."

The above cases teach that it is the duty of the master not only to furnish reasonably safe appliances for the use of his servants, but to use reasonable care to see that the appliances are kept in that condition; that his duty to inspect is not performed by a mere formal or perfunctory inspection; that it is not to be disregarded or neglected simply because his business is pressing, that he cannot shift the responsibility by dele-

gating the performance of the duty to a servant, and that whether, in any case, the master has exercised the care in this respect that the law requires, is a question for the jury.

The jury in the case at bar by their verdict have said that the master did not exercise that care in inspecting this car that the law requires, and the evidence amply sustains the verdict. As we have already said, the only theory advanced by defendant as to the cause of the accident is that the train was running at a dangerous speed. If that theory does not hold, then defendant says the wreck was one of those unexplainable accidents incident to railroad traffic, and some of its witnesses, employees, said they could not conjecture how it occurred. Upon this defendant argues that the burden being on the plaintiff to prove his case, it devolves on the plaintiff to show how the accident did occur.

The burden is on the plaintiff to show that the injury was the result of defendant's negligence, but the plaintiff has not the affirmative of every question of fact that arises out of the evidence in the case. In Blanton v. Dold, 109 Mo. 64, which was a master and servant case, this court, per BARCLAY, J., said: "The mere fact of an injury to plaintiff does not necessarily create a liability or warrant an inference of defendant's negligence. The burden of proof was on the plaintiff to establish, directly or by just inference, some want of care to which his injury might fairly and reasonably be traced. But some catastrophes are of a nature such as to carry, in a mere statement of their occurrence, an implication of some neglect. In such event, 'the thing itself speaks,' as some judges have expressed it; often in Latin, though the idea is none the less forcible or clear in our mother tongue. [Byrne v. Boadle (1863), 2 H. & C. (Exch.) 725; Briggs v. Oliver (1866), 4 H. & C. (Exch.) 407.]"

Judge THOMPSON in his latest work on Negligence on this point says: "I have ventured to call it *demon-*

*strative evidence of negligence;* for, although the evidence must always be detailed by the mouths of witnesses, yet when the facts are thus disclosed, they either demonstrate negligence conclusively, or tend to demonstrate it, subject to explanation by the defendant showing that his conduct was consistent with due care. The principle is generally expressed in the Latin formula, '*res ipsa loquitur,*' 'the thing itself speaks.' The meaning was thus expressed by ERLE, J., in giving his judgment in a noted case: 'Where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.' This definition has met with such general approval at the hands of judges in subsequent cases that it has become, so to speak, a legal classic. The meaning is not that the mere happening of an accidental injury is, of itself and in the abstract, presumptive evidence of negligence; it is that in the numerous cases which fall within the above definition of the principle, the fact of the accident, when viewed in connection with the circumstances under which it took place, tends to demonstrate negligence, subject to explanation.''

When the thing itself has spoken and given demonstrative evidence of negligence the effect is to make a *prima facie* case for the plaintiff, calling on defendant to show that notwithstanding the condition of the thing the defendant had in fact exercised the degree of care imposed by law to discover or remedy the defect and had been unable to do so. Discussion of this subject is found more frequently and the rule is applied with greater force, in cases between passengers and carriers, but it is the law applicable also to master and servant. The difference in the application to the case of a passenger and to that of a servant is in degree. A carrier

owes to its passenger a very high degree of care, while to its servant it owes only ordinary care. Therefore when the broken and defective thing has itself spoken, if it is a passenger who is injured, the carrier is liable unless it can show that it did exercise the degree of care that was due the passenger or that the defect was such that it could not have been discovered or remedied by the exercise of such care; but in the case of an employee the carrier is excused if it shows that it used ordinary care, or that the defect was such that it was beyond discovery or remedy by the use of ordinary care. In each case, however, the thing itself speaks and calls for explanation from the other side, it being more easily satisfied by the showing made in the case of the employee than in that of the passenger. We again quote from Thompson on Negligence: "The very nature of this presumption is such that it takes the question of the negligence of the defendant to the jury in all cases. It requires him to explain the accident consistently with the conclusion of due care on his part; and whether he succeeds in doing so is necessarily a question of fact for the jury. The judge cannot decide that he has done so, without trying a question of fact, passing upon the credibility of witnesses, and deciding that an affirmative proposition of fact has been proven. This cannot be done in any jurisdiction where the system of trial by jury is properly understood and correctly maintained. Judges who undertake to perform this office in the place of juries, usurp the office of juries, and seize a jurisdiction which, it may well be assumed, has not been committed to them by the Constitution, or laws of any American jurisdiction, Federal or State." [3 Thomp. Neg., sec. 2773.]

In the case at bar the rotten and broken car has told its story, and the defendant has attempted to show that notwithstanding that story it had done all that the law required to discover and remedy the defect, and had been unable to do so. It was for the jury to say whether

the defendant made a sufficient showing of having done its duty. We have seen what the evidence was, we have seen the verdict of the jury, and so far from saying that the jury could have been led to that verdict only through prejudice or passion, we are satisfied that on the question of inspection the evidence amply justifies the verdict.

But it is argued that we cannot accept as true the story that the broken car tells unless it tells the same story to every one. That would be sound reasoning if it were possible for the thing speaking to tell one story to one man and another story to another. If that could be so, the inanimate witness would impeach itself, as an animate witness has sometimes done. But it is impossible for the thing to tell contradictory stories. It speaks to everyone alike, it tells but one story, and its story is true; it cannot be false. If different men understand it differently, or tell it differently, the difference is in the men, not in the thing.

Suppose a witness is called in a trial, who speaks only the Russian language, which, possibly, is not familiar to the court or the jury or the counsel, and each side calls an interpreter, who is sworn and who undertakes to translate into English what the witness speaks in Russian, but one of the interpreters testifies that the witness said it was this, while the other testifies that he said it was that. Are we therefore to say that the Russian witness contradicted himself and is unworthy of belief? He has told but one story, the conflict is between the interpreters. How, then, are we to decide as to what the Russian has really said? We must put those two interpreters into the judicial scales and weigh them, judge them by their apparent intelligence and learning as men and by their apparent fairness and sincerity as witnesses. That is the only way in which a verdict can be reached when the testimony is conflicting. To decide such questions is peculiarly the duty of the jury.

When the thing itself speaks, whilst it tells but one

story, and that a true one, it is not always understood by all men alike. Honest and intelligent men may differ as to the story it tells, but that difference is in the men; the triers of the fact are not justified in discarding the testimony of the inanimate witness because all men do not interpret it alike, but it is their duty to find the true meaning and give effect to it in their verdict.

The testimony shows that when this wreck occurred, the roar and thunder of the crushing cars against each other was so great that people for miles around heard it and were thereby attracted to the scene, and when they arrived, this is what they saw: The front car broken in two, the front part, still coupled to the tender was off the rails as were also the wheels of the tender and engine except the small front wheels of the engine, the rear part of the broken car was still on the track, the front ends of its sills had dropped down, plowing into the ground and forming a barrier or brake against which nearly all the other cars in the train had crushed and broken, the plaintiff under one of the cars mangled and crippled in a most distressing manner. Now, it is contended that the situation speaking for itself, tells two different stories and therefore is unworthy of belief. To some men, viewing it, the story it tells is that the car broke in two, the broken ends of the sills dropped down forming the barrier or brake, as above described, against which the other cars crushed and broke and that was the cause of the wreck. To others it seems to tell a story consistent with the theory that the car might have gone off whole, rolled down the bank, then broke in two and the rear part got back on the track in time to form the breaker for all the other cars as they "came tumbling after."

Certain it is if the car did break in two and the ends of the sills did drop down and form a barrier as described, the result would naturally have been just the wreck that did occur. And certain it is that if the timbers of the car were rotten they were liable to break

from that fact. Therefore, given the rotten timbers, the broken car, and the wreck, what more is needed to make a prima facie case for the plaintiff?

But it is argued that the tender and some of the wheels of the engine were off the rails and that unless the plaintiff can demonstrate that the breaking of the car pulled the engine off the track the presumption must be indulged that the wreck was caused by the engine leaving the track, and therefore that the defect in the car had nothing to do with the wreck. The derailment of the engine was not a very serious affair. The front wheels remained on and the wheels that did go off were still close to the rails. The engine was soon put back on the track and went on to Sedalia.

The defendant's engineer testified that the crash occurred before his engine went off the rails. This he said more than once in the course of his testimony, but even if the engine had left the rails first it does not follow that the car would have broken in two if it had been fit for service. It must be remembered that this car did not break, like the other cars in the train did, by striking against a barrier; it did not crush against the tender and break it, but broke from its own inability to stand the strain, and the evidence strongly tended to show that the inability was because of its rotten timbers.

But the burden is not on the plaintiff to account for every detail of the wreck, not essential to his prima facie case. When he shows the rotten timbers, the broken car and a condition that would naturally result therefrom, he has made out a case that calls for an explanation from the defendant. A wreck of the train might or might not have been the consequence of the engine leaving the rails. Engines leaving (or partly leaving as this did) the rails do not always cause a wreck like this. But if the engine leaving the track would have had the effect of causing a wreck of the train, it would not have been the kind of wreck that did occur in this case, unless this car had broken in two as it did. The breaking of

this car in two, the dropping of the broken ends of its sills upon the track so as to form a barrier against which all the other cars in the train crushed and broke, constituted a feature of this wreck, without which whatever other kind of wreck might have followed in consequence of the engine leaving the track, this particular wreck would not have occurred. The breaking of this car in two as this did would have caused exactly the wreck that did occur, whether the engine left the track or not, but the leaving of the track by the engine would not have produced this particular wreck if the car had not broken in two. The breaking of this car, just as it did, was the *sine qua non* of this accident. The car broke either because its timbers were rotten, or it broke from some other cause; the plaintiff has shown that the timbers were rotten, and it is for the defendant to show either that they were not rotten or that it exercised due care to discover the defect and was unable to do so.

The trial court did not err in submitting this case to the jury, and there is nothing in the case to justify the charge that the verdict of the jury was the result of prejudice or passion.

## II.

It is contended that the court committed error in allowing the plaintiff to introduce evidence as to the character of defendant's inspection in rebuttal. This contention proceeds on the idea that it was a part of the plaintiff's case in chief to show that the inspection was not sufficient. But that is a mistaken idea. When the plaintiff made out his prima facie case the burden was on the defendant to overcome the plaintiff's case either by showing that the car was not defective or that it had used due diligence in the matter of inspection. If the defendant had rested alone on showing the car was sound, the plaintiff would have had no right to come back with more evidence on the same point. But evi-

dence by defendant of inspection was affirmative in its character and plaintiff had the right to rebut it.

### III.

The plaintiff was called as a witness for himself in rebuttal and after he had testified and been cross-examined on the point in rebuttal the counsel for defendant began to question him on another point, but the court interposed and ruled that the cross-examination should be restricted to the matter for which he was recalled and examined in rebuttal. Counsel for plaintiff said they had no objection to counsel for defendant asking witness any question they desired, but the court ruled contra. Then the counsel for defendant stated what they offered to prove by the witness, and counsel for plaintiff stated that they admitted that the fact so stated was true.

The trial court was justified in its ruling. This witness had been on the stand before, and was cross-examined at length, he was recalled only in rebuttal and under the circumstances the court had a right to restrict the cross-examination as it did. Besides, when the counsel for plaintiff admitted that the fact offered to be proven was true, even if the court's ruling had been wrong, no harm was done.

### IV.

The court at the request of the defendant gave fifteen instructions to the jury and refused two. The first refused instruction was to the effect that though the jury might believe from the evidence that defendant's yards at Kansas City were sometimes so crowded that proper inspection could not be given, yet there was no evidence that such was the condition the morning in question, and therefore the jury should consider the question of inspection on the theory that the inspectors had the ordinary and usual time for inspection.

The question of whether there had been a proper inspection of the car at Kansas City was one for the jury. The defendant had undertaken to prove the affirmative and had introduced evidence to show what was done in that respect, and the time afforded for doing it. The car in question was one of a train of thirty-two cars that came in that morning from Atchison. It went out in another train of a less number of cars. The train as it had come in from Atchison, therefore, was broken up in the switch yard and this train made up there. The hour of the arrival of the train from Atchison and that of its departure from Kansas City were in evidence, as was also what was done in the way of inspection while there. The court had no more right to tell the jury that there was ample time to inspect than it had to tell them that the inspection was ample. Besides, the defendant asked and the court gave another instruction, number 14, directing the jury to find from the preponderance of the evidence whether or not the condition of the yards at Kansas City on that morning was such as to afford time and opportunity for inspection. A party cannot at his own request have a question submitted to the jury and at the same time another instruction telling them there is no such question in the case.

The second refused instruction was that if the jury should find that the injuries of the plaintiff were purely the result of an accident, then no one was to blame and the verdict must be for the defendant.

The proposition contained in that instruction is covered by other instructions given. Not only do the instructions for the plaintiff place his right to recover solely on the ground that the evidence proves that the injury resulted from the rotten condition of the car, but the instructions for defendant single out and emphasize that fact and tell the jury that the burden of proving it is on the plaintiff, and unless he does prove it the verdict must be for the defendant. Then in instruction

6 the jury are told that if they are unable to determine whether the injury resulted from that or some other cause they must find for the defendant. The legitimate purpose of instructions is to aid a jury. A party has a right to instructions giving the law to the jury on every issue to be tried by them, but a multitude of instructions repeating the same propositions and varying only in form of expression often have the effect of bewildering rather than enlightening the jury.

There was no error in refusing those instructions.

## V.

By agreement of parties a copy of the bill of exceptions in the former case was produced at this trial, and it was agreed that either party might use it the same as if it were the original bill. This document contained among other matters the deposition of the engineer, Donnelly, who had been a witness for the defendant at the other trial, but was not present at this trial. It seems that on one question of fact his evidence favored the defendant, and on another it favored the plaintiff, and neither party saw fit to read the deposition at this trial.

In the argument of the case to the jury one of the counsel for plaintiff, discussing the question of how far the engine ran after it left the rails, referred to the testimony of one of his witnesses, Lafferty, and then said that of all men the engineer knew more about when the engine left the track than any one else, that his evidence was on file, that defendant's counsel knew that that evidence was against him on that point, and he dared not read it; that "if the engineer had sworn on his belief as to when the engine jumped the track," the attorney for the defendant would have put the testimony in. Counsel for defendant excepted to the remark and said that the plaintiff had filed the evidence in court, to which counsel for plaintiff replied that he did not care whose

evidence it was when it was filed, it was there for defendant to use if it wants it, and he would guarantee that the testimony did not "agree with defendant's theory of the case or he would have used it." Defendant again excepted to the remark, saying that the counsel had no right to assume that the evidence was against the defendant, and asked the court to instruct the jury to that effect. The court remarked that either party had the right to read the deposition, and that if neither read it the jury might infer that neither wanted to read it. Plaintiff's attorney then said that if counsel for defendant wished to read it he might do so then. Thus challenged the counsel for defendant read the deposition.

Counsel for appellant in their brief complain bitterly of this, and use strong language concerning it.

This incident did not occur in the closing argument for the plaintiff, when defendant had no opportunity to reply. Whatever there was in the remarks of counsel that may be construed as misleading was corrected not only by the statement of counsel on the other side, but also by the reading of the deposition to the jury. If there was any misstatement of a fact, the court at the time it was required to rule on the objection did not know it. The deposition had not then been read in evidence and the court knew no more of it than did the jury.

Whilst the reference by the counsel to the testimony of the engineer, in close connection with what Lafferty had said as to the distance the engine had run after leaving the rails, might be construed as meaning that the engineer would have corroborated Lafferty on that point, yet the counsel did not say that. He did say that the engineer knew better than any other man "when the engine and tender left the track," and that counsel for defendant knew that the engineer's testimony on that point was against him. The testimony of the engineer as to the time the engine left the track,

with reference to the time the crash of the car was heard, was against the defendant, but with reference to how far it ran after leaving the rails, the engineer's testimony conflicted with that of Lafferty.

We do not see how the defendant could have been injured by this incident. Whatever there was in dispute as to the contents of the deposition, was settled by the reading of the deposition in evidence.

The record in this case contains more than eight hundred printed pages. We have gone through it with patience and labor, aided by oral arguments and elaborate briefs on both sides, and we find nothing that would justify disturbing the verdict of the jury or the judgment of the court.

The judgment ought to be affirmed. BRACE and GANTT, JJ., concur with the writer in this opinion.